**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RICHARD SMITH,** | : | **CIVIL ACTION NO. 1:08-CV-1277** |
| **Plaintiff,** | : | **(Judge Conner)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **DAUPHIN COUNTY CORRECTIONS SERGEANT KUZO, et al.,** | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

## I.    Introduction

    This case, which comes before the Court on a motion for partial summary judgment, calls upon the Court to assess the extent to which prison supervisors or local government entities can be held accountable for the alleged misdeeds of their employees. This legal, constitutional question comes before the Court in the context of an a specific, isolated incident, the alleged staff assault on an inmate, committed by third shift correctional staff outside the presence of the prison warden.

    While no party has presented evidence that the warden was present when the assault took place, participated in the assault, condoned the assault, or had personal knowledge of the assault, the Plaintiff seeks to hold the warden and county prison board personally liable for this act. The warden and prison board, in turn, urge the Court to grant this motion for partial summary judgment and dismiss them as Defendants in this case.

    For the reasons set forth below, it is submitted that in the absence of competent evidence that the warden or prison board knew, and acquiesced, in these actions,

these prison supervisors may not be held legally accountable for the alleged acts of their subordinates. Therefore, it is recommended that the motion for partial summary judgment be granted.

## II. Statement of Facts and of the Case

### A. The July 2006 Booking of Richard Smith at Dauphin County Prison

In this case the material, and undisputed facts, can be simply stated.

This case arises out of a single incident, what is alleged to have been a late night encounter at the Dauphin County prison between the Plaintiff, Richard Smith, a prisoner who was being booked into that facility, and various corrections officers. That encounter occurred on July 6, 2006, when Smith was arrested on an outstanding warrant following an altercation with his girlfriend. (Doc. 36, Ex. A at 23-25). Smith was charged with two counts of terroristic threats and two counts of harassment. *Id.* Smith was arraigned on these charges, bail was set, and when Smith could not post bond, he was transported to the Dauphin County Prison ("DCP"). (Doc. 36, Ex. A at 26-27).

According to Smith, upon his arrival at the prison he was taken to the intake area where new commitments have their personal property taken from them to be stored in administrative or booking safes. (Doc., 1, ¶¶15-21). In this inmate intake area, known as the "shakedown" unit, one of the Defendants, Sergeant Kuzo, photographed Smith. (Doc. 36, Ex. A at 32-33). Consistent with prison policy, Smith also underwent a strip search at this time. (Doc. 29 at 6). According to Smith, during this late night intake processing he was physically and verbally assaulted by several corrections officers on the third shift, including Defendants Kuzo, Chris Miller, James Miller and others in the "shakedown" unit. (Docs. 1 and 36). Smith alleges that he suffered physically injury as a result of the conduct of the Defendants. (Docs. 1 and 36).

## B. Warden DeRose and Prison Policies at Dauphin County Prison at the Time of the July 2006 Incident

Smith does not claim that Warden DeRose was present when this incident allegedly took place. Nor does he assert that Warden DeRose ever physically assaulted him in any fashion, or directed that a physical assault occur. Rather, Smith seeks to hold Warden DeRose liable in this matter, as a supervisory prison official, asserting that his overnight and supervision of his staff was so fatally deficient that he should be held personally liable for this alleged assault.

In order to assess this claim, it is important to briefly consider the role of Warden DeRose at the prison, and prison policies that were in place at the time that Smith was detained at this facility. At the time of this July 2006 incident, Dominick DeRose had been the warden at Dauphin County Prison for fifteen years, and had served at the prison for almost twenty years. (Doc. 29 at 2). As warden, DeRose is responsible for implementing prison policy as set by the Prison Board. Id. The Dauphin County Board of Prison Inspectors ("Prison Board"), in turn, is responsible for the policies and administrative duties of the DCP. (Doc. 29 at 2). The Chairman of the Prison Board reviews all DCP incident reports and conducts surprise inspections of the DCP without the Warden being present. (Doc. 29 at 2). Warden DeRose's role was the enforce and apply, the policies implemented by the prison Board. (Id.)

In the summer of 2006, the prison had several policies in place governing staff training, intake processing of inmates and investigating allegations of staff misconduct.

## 1. Staff Training Policies

With respect to staff training requirements, in 2006 all newly recruited correctional staff were placed on probation for six (6) months and their performance was closely monitored during this time.(Doc. 29, ¶ 9.) Upon commencing duty at the

prison all new corrections officer recruits received a copy of and were trained regarding the Prison's policies. Policies that included a Use of Force Policy.(Id., ¶10.)

Notably, this use of force policy at Dauphin County Prison articulated by Warden DeRose called upon staff to utilize a "continuum of force" when enforcing lawful staff orders. Under this force continuum principle, staff are specifically admonished to apply the minimum degree of force necessary to ensure safety and order in the prison. (Doc. 29.1, pp. 8-10).

Each new recruit also received two weeks of classroom training and two weeks of shadowing a senior officer prior to being assigned a duty post. (Id., ¶ 11.) Furthermore, all corrections staff were required to attend the Pennsylvania Department of Corrections Training Academy where they receive five additional weeks of training. (Id., ¶12.)

As part of this five week training curriculum, the Corrections Academy specifically provided training on effective communications skills, applied professional and ethical behavior, and the proper use of force. (Id., ¶ 13.) After receiving this initial training, all corrections officers were required to undergo additional annual training. (Id., ¶14.) In 2006, in addition to other supplemental training, the prison provided all officers with the following course: Serious Mental Illness: What Correctional Personnel Need to Know ("FTAC"). This course specifically provides training on how to identify and respond to individuals who exhibit aberrant behavior and also discussed how to properly and safely diffuse situations involving mentally ill persons and substance abuse. (Id., ¶ 15.) By July of 2006, all of the correctional staff named by Smith as direct participants in this July 6, 2006 incident had received this training mandated by the Warden and Prison Board. Specifically following officers received the FTAC training on the following dates: Jeffrey D. Yohn, February 22, 2006; James W. Heckard, Jr., February 14, 2006; James R. Miller, February 14, 2006; Andrew J. Glazewski, January 31, 2006; and Anthony B. Kuzo, May 2, 2006. (Id., ¶16.)

## 2. Prisoner Intake Policies

In addition by 2006 the Warden and prison had adopted written policies governing prisoner intake processing. This policy prescribed the sequence of events with respect to how a new prisoner was processed, and set procedures for collecting property, completing forms, issuing Prison property, and photographing inmates. (Id., ¶21.) As part of this intake processing, in 2006, the Prison had a strip search policy. Smith met the criteria set by this policy and was required under prison policy to submit to a strip search when he first entered the prison population. (Id., ¶ 22.)

## 3. Policies Regarding Investigation of Allegations of Staff Misconduct

Finally, in 2006 the Warden and the prison board had in place established policies governing investigation of allegations of staff misconduct. There were two aspects of this policy. First, as part of the policy, the Warden was authorized to institute an internal inquiry into the alleged misconduct. As part of this process, typically the Warden would ask a senior shift commander of a different shift to perform a medical assessment of the complaining inmate. The Warden would obtain any incident report (referred to as an Extraordinary Report "EO") of the incident to review and provide a copy to the shift commander. The protocol that would then be followed would be for the shift commander to interview the inmate and have a medical practitioner examine the inmate to document any injuries, which would be photographed. The shift commander would then forward a report of the investigation to the Warden for his review (Id., ¶¶ 24 and 25.)

In addition, in 2006 the prison had a practice where any allegations of inappropriate or excessive force are referred to the Dauphin County District Attorney's Criminal Investigation Division ("CID") for investigation. Once a matter is referred CID is given full access to the jail. The only involvement with CID that the

prison has is to provide information and documents if requested. CID conducts an independent investigation.. (Id., ¶¶27-29.)

### C. Warden DeRose's Handling of Smith's July 2006  Excessive Force Complaint

In this case, it is undisputed that Warden DeRose did not learn about the July 6, 2006 intake incident involving Smith until several days after it had occurred, when the Warden received notice of the incident by way of a phone call from a relative of Smith who claimed that Smith had suffered from injuries. In response to this report, the Warden followed his established protocols for assessing allegations of misconduct by staff, assigning a manager to conduct an independent internal assessment, and referring the allegation to  the Dauphin County District Attorney's Criminal Investigation Division ("CID") for investigation. According to Warden DeRose, he subsequently received a report from the supervisor assigned to look into the matter relating to Richard Smith, a report which did not corroborate Smith's complaints. (Id., ¶¶ 23-26.)

### D. Litigation History

Richard Smith commenced this action by filing a complaint on July 3, 2008 pursuant to 42 U.S.C. § 1983 alleging violations of the Fourth and Fourteenth Amendments against the Defendants stemming from this July 6, 2006 incident. (Doc. 1). The Defendants named in the complaint included the correctional staff allegedly involved in this incident, Warden DeRose and the Dauphin County Prison Board. (Id.)

On January 29, 2010 the Defendants filed a Motion for Partial Summary Judgment, along with a brief.  (Docs. 27 and 28). In this motion, the Defendants sought dismissal of the Warden and Prison Board from this action, arguing that the undisputed facts failed to show sufficient involvement, approval or acquiescence by these Defendants in the alleged actions of corrections staff to hold these Defendants

personally liable. This motion has been fully briefed by the parties, and is now ripe for resolution.

For his part, Smith does not contend that Warden DeRose or the Prison Board were directly involved in this alleged assault. Instead, Smith contends that the culpability of these Defendants is established through their approval or acquiescence in a pattern of misconduct by third shift corrections staff, and their failure to adequately train staff. While not seriously disputing the facts surrounding this particular incident, Smith asserts that there are unresolved factual issues regarding the culpability of both the Warden and the Prison Board. To support this argument Smith relies upon disparate elements of proof which he contends creates disputed and material factual issues precluding summary judgment. Thus, as part of his response to this motion, Smith offers the depositions of three inmates, John Richardson, Neal McCollum and Leroy Bradley as evidence that the Corrections Officers at the prison inflict beatings upon new arrivals. (See Doc. 36, Exs. B, C, D). For his part, Inmate Neal McCollum stated that the inmates referred to the Prison's third shift as the "Raiders of the Night" and the "Goon Squad" and stated that he regularly heard corrections officers of the third shift bragging about beating "the hell out of another nigger last night." (Doc. 36, Ex. C). Inmates John Richardson and Leroy Bradley, in turn, stated that it was common knowledge at the DCP that the third shift inflicted beatings. (Doc. 36, Ex. B, Ex. D). None of these inmates, however, offered any direct testimony establishing that Warden DeRose and the Prison Board either knew of, and acquiesced in, this use of force. (Id.)[1] Smith also cited to an incident which occurred one year after the alleged assault in which he claims he was a victim as proof of supervisory knowledge of staff misconduct, noting that in July of 2007, the NAACP and the Dauphin County Prison Board jointly held a public forum to discuss the

---

[1]Warden DeRose stated during his deposition that he was unaware of the alleged reputation of the DCP third shift corrections officers and that had never heard the terms "Raiders of the Night" and "Goon Squad." (Doc. 30, Ex. 1 at 22)

concerns and grievances former inmates and the public had regarding the prison and various individuals testified as to issue of beatings at the prison. (Doc. 36, Ex. F).

Finally, Smith tendered a statements by an expert witness, Harry C. McCann, Jr., Director of Law Enforcement Training for Bucks County. In this statement, McCann, who has no direct knowledge of the events at the prison, opined that, if it was common knowledge that inmates were being assaulted, then it was inconceivable that Warden DeRose was unaware of the reputation of the corrections officers and their supervisors. (Doc. 36, Ex. E). On the basis of these assertions, Smith sought to defeat this motion for partial summary judgment.

We find that Smith's efforts are unavailing, since the factual record in this case is devoid of evidence that would properly permit submission of this case to a jury on the issue of supervisory liability, which must be premised on evidence of actual subjective knowledge and acquiescence in staff misdeeds, something that is entirely lacking here. Accordingly, it is recommended that the motion for partial summary judgment be granted.

## III.   Discussion

### A.   Summary Judgment –Standard of Review in §1983 Actions

Summary judgment is appropriate when: (1) there are no material facts in dispute; and (2) one party is entitled to judgment as a matter of law. See Int'l Union, United Mine Workers of Am. v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir.1990) (citing Fed. R. Civ. Pro. 56(c)). A district court may properly grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248(1986). "Material facts" are those which might affect the outcome of the suit. Id.; Justofin v. Metropolitan Life Ins. Co., 372 F.3d 517, 521 (3d Cir.2004).

Regardless of who bears the burden of persuasion at trial, the party moving for summary judgment has the burden to show an absence of genuine issues of material fact. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir.1996) (citations omitted). To meet this burden when the moving party does not bear the burden of persuasion at trial, the moving party must show " 'that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial.' " Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir.1989) (quoting Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d. Cir.1987)); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). More simply put, a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim. Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir.1991).

Once the moving party meets its burden of showing an absence of genuine issues of material fact, the nonmoving party must provide some evidence that an issue of material fact remains. Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party, however, cannot do so by merely offering general denials, vague allegations, or conclusory statements; rather, the party must point to specific evidence in the record that creates a genuine issue as to a material fact. Celotex, 477 U.S. at 32; Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir.1999).

Moreover, a party who seeks to resist a summary judgment motion by citing to disputed material issues of fact must show by competent evidence that such factual disputes exist. Thus, "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment." Countryside Oil Co., Inc. v. Travelers

Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995). This rule applies with particular force to parties who attempt to rely upon hearsay statements to establish material issues of fact which would preclude summary judgment. With respect to such claims, it is well-settled that: "In this circuit, hearsay statements can be considered on a motion for summary judgment [only] if they are capable of admission at trial." Shelton v. University of Medicine & Dentistry of N.J., 223 F.3d 220, 223, n. 2 (3d Cir. 2000), citing, Stelwagon Mfg. V. Tarmac Roofing, Suys., Inc., 63 F.3d 1267, 1275, n. 17 (3d Cir. 1995). In this regard it has been aptly observed that:

> It is clear that when considering a motion for summary judgement, a court may only consider evidence which is admissible at trial, and that a party can not rely on hearsay evidence when opposing a motion for summary judgment. See Buttice v. G.D. Searle & Co., 938 F.Supp. 561 (E.D.Mo.1996). Additionally, a party must respond to a hearsay objection by demonstrating that the material would be admissible at trial under an exception to hearsay rule, or that the material is not hearsay. See Burgess v. Allstate Ins. Co., 334 F.Supp.2d 1351 (N.D.Ga.2003). The mere possibility that a hearsay statement will be admissible at trial, does not permit its consideration at the summary judgment stage. Henry v. Colonial Baking Co. of Dothan, 952 F.Supp. 744 (M.D.Ala.1996).

Bouriez v. Carnegie Mellon University, No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005) Thus, a party may not rely upon inadmissible hearsay assertions to avoid summary judgment. Therefore, where a party simply presents inadmissible hearsay declarations in an attempt to establish a disputed material issue of fact, courts have typically rebuffed these efforts and held instead that summary judgment is appropriate. See, e.g., Synthes v. Globus Medical, Inc., No. 04-1235, 2007 WL 2043184 (E.D.Pa. July 12, 2007); Bouriez v. Carnegie Mellon University, No. 02-2104, 2005 WL 2106582,* 9 (W.D.Pa. Aug. 26, 2005); Carpet Group International v. Oriental Rug Importers Association, Inc., 256 F.Supp.2d 249 (D.N.J. 2003).

These principles apply with particular force to a § 1983 civil rights action, where the Plaintiff must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law;

and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States. <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981); <u>Kost v. Kozakiewicz</u>, 1 F. 3d 176, 184 (3d Cir. 1993). Further, Section 1983 is not a source of substantive rights. Rather, it is a means to redress violations of federal law by state actors. <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 284-85 (2002). Therefore, any assessment of a summary judgment motion, must begin by examining the nature of the constitutional rights allegedly violated, and the legal tenets governing civil liability for these constitutional torts.

## B.      Supervisory Liability in Eighth Amendment Claims.

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of respondeat superior. <u>See, e.g.,</u> <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976); <u>Hampton v. Holmesburg Prison Officials</u>, 546 F.2d 1077, 1082 (3d Cir. 1976); <u>Parratt, supra</u>. Rather, it is well-settled that in order to hold a defendant liable for a civil rights violation, a plaintiff is required to allege that the defendant had personal involvement in the violation alleged, because supervisory liability is not available as a basis for relief in a <u>Bivens</u> action. <u>See</u> <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (supervisors "may not be held accountable for the misdeeds of their agents"); <u>Huberty</u>, 316 F. App'x at 122; <u>Ruiz Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir. 2000) (collecting cases holding that *respondeat superior* liability is unavailable as a basis for relief in <u>Bivens</u> actions); <u>cf.</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207-08 (3d Cir. 1988) (holding that there is no *respondeat superior* liability in cases brought pursuant to 42 U.S.C. § 1983). Although liability may not be predicated upon *respondeat superior*, the requirement that a defendant have personal involvement in the alleged wrongs may be satisfied upon a showing of "personal direction or of actual knowledge and acquiescence." <u>Id.</u>; <u>Pansy v. Preate</u>, 870 F. Supp. 612, 630 (M.D. Pa. 1994).

-11-

These principles limiting supervisory liability apply with particular force in an Eighth Amendment context since:

> An Eighth Amendment claim against a prison official must meet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind."

Beers-Capitol v. Whetzel, 256 F.3d 120, 125 (3d Cir. 2001)(quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  Furthermore, in cases involving prison safety or prison conditions, the relevant state of mind "is one of 'deliberate indifference' to inmate health or safety."  Id.  As discussed more fully below, this deliberate indifference standard "is a subjective standard under Farmer – the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."  Id.

As explained in Beers-Capitol, in cases based on allegations of deliberate indifference on the part of prison officials or other supervisory defendants, the Supreme Court has "rejected an objective test for deliberate indifference; instead it looked to what the prison official actually knew rather than what a reasonable official in his position would have known."  Id. at 131.  Specifically, the Supreme Court "held that 'a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'"  Id. (quoting Farmer, 511 U.S. at 837).  This requirement of actual knowledge on the part of supervisory officials "means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting Farmer, 511 U.S. at 837).

At the same time, this subjective standard does not insulate officials from liability where such officials choose to remain deliberately indifferent to an excessive or substantial or serious risk of harm to inmates. The Supreme Court explained:

> We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm would actually befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.

Farmer, 511 U.S. at 842. The Supreme Court also noted that a supervisory defendant's knowledge of a risk may be proved through circumstantial evidence, so that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. Although the Third Circuit has recognized that a mere generalized knowledge that prisons are dangerous places does not give rise to an Eighth Amendment claim, see, e.g, Jones v. Beard, 145 F. App'x 743 (3d Cir. 2005), the Third Circuit did interpret Farmer to signal that "a plaintiff could make out a deliberate indifference case by showing that prison officials simply were aware of a general risk to inmates in the plaintiff's situation[.]" However, in order to show deliberate indifference in this fashion, a plaintiff would need to come forward with evidence to showing a substantial basis for demonstrating that a prison official was deliberately indifferent in the face of information or indicators that presented a substantial risk to inmate safety. See Farmer, 511 U.S. at 842-43 ("If an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence would permit a trier of fact to find that the defendant-official had actual knowledge of the risk.") (emphasis added).

-13-

Even where a plaintiff has presented sufficient evidence to allow a factfinder to reach the inference that a prison official had knowledge of the risk on the basis that risk was obvious, it is clear that an inference may not be compelled, and that the prison official must be permitted to show that he was actually unaware of the risk in question. Beers-Capitol, 256 F.3d at 132. Lastly, a prison official who is shown to have been actually aware of a risk to a prisoner-plaintiff can avoid liability if he shows that he responded reasonably to the risk, even if the response did not avoid the ultimate harm. Id.

In addition to the foregoing analysis applicable to claims brought against supervisors under the Eighth Amendment alleging deliberate indifference to a known excessive risk, the Third Circuit also recognizes that supervisors may be exposed to liability on the basis that they maintained deficient policies that resulted in the plaintiff sustaining an Eighth Amendment injury. In these kinds of cases based upon allegations of deficient policies, the Third Circuit has fashioned a four-part test based upon the reasoning of City of Canton v. Harris, 489 U.S. 378 (1989), for supervisory liability on an Eighth Amendment claim for failure to supervise. Under this test, "the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (3) the injury resulted from the policy or practice." Beers-Capitol, 256 F.3d at 134 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989). Accordingly, these approaches are summarized as follows:

> In sum, to make out a claim of deliberate indifference based on direct liability (i.e., insofar as the defendants are alleged to have known of and ignored the particular risk that Whetzel posed, the plaintiffs must meet the test from Farmer v. Brennan: They must show that the defendants knew or were aware of and disregarded an excessive risk to the plaintiffs' health or safety, and they can show this by establishing that the risk was obvious. For the plaintiffs' claims seeking to hold supervisors liable for their deficient policies, Sample's four-part test provides the analytical

structure for determining whether the policymakers exhibited deliberate indifference to the plaintiffs' risk of injury, it being simply the deliberate indifference test applied to the specific situation of a policymaker.

Id. at 135.

Thus, in order to defeat a motion for summary judgment, a plaintiff alleging deliberate indifference on the part of prison officials "must present enough evidence to support the inference that the defendants knowingly and unreasonably disregarded an objectively intolerable risk of harm." Id. at 132. Applying these benchmarks, courts have frequently held that, in the absence of evidence of supervisory knowledge and approval of subordinates' actions, a plaintiff may not maintain an action against supervisors based upon the misdeeds of their subordinate. For example, in O'Connell v. Sobina, No. 06-238, 2008 WL 144199, * 21 (W.D. Pa. Jan. 11, 2008), the court rejected an effort to hold supervisors liable for the acts of staff holding that:

> Personal involvement by a defendant can be shown by alleging either personal direction or actual knowledge and acquiescence in a subordinate's actions. Rode, 845 F.2d at 1207. "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Id. See also Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). Moreover, in order to maintain a claim for supervisory liability, a plaintiff must show: 1) that the supervising official personally participated in the activity; 2) that the supervising official directed others to violate a person's rights; or 3) that the supervising official had knowledge of and acquiesced in a subordinate's violations. See Robinson v. City of Pittsburgh,120 F.3d 1286, 1293 (3d Cir. 1997); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

Similarly, in Neuburger v. Thompson, 305 F. Supp. 2d 521, 535 (W. D. Pa. 2004), the Court rejected an effort to extend civil rights liability to supervisory officials without proof of personal involvement or acquiescence in wrongdoing, stating:

> Third Circuit case law recognizes that "(a) defendant in a civil rights action must have personal involvement in the alleged wrongs" in order to be liable. Sutton v. Rasheed, 323 F.3d 236, 249 (3d Cir.2003) (citing

Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir.1988)). Consequently, a supervisor may be liable under 42 U.S.C. § 1983 for his or her subordinate's unlawful conduct if he or she directed, encouraged, tolerated, or acquiesced in that conduct. See Blanche Road Corp. v. Bensalem Twp., 57 F.3d 253, 263 (3d Cir.1995); Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir.1995). However, the mere assertion "that the constitutionally cognizable injury would not have occurred if the superior had done more than he or she did" is insufficient to establish liability. Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir.1989). Likewise, a supervisor's mere failure to train, supervise or discipline subordinate officers does not state a basis for a § 1983 claim against the supervisor absent proof of direct participation by the superior in some unlawful conduct. Mobley v. City of Atlantic City Police Dept., No. Civ. A. 97-2086JBS, 2000 WL 363692 at *3 (D.N.J. March 30, 2000) (citing Brown v. Grabowski, 922 F.2d 1097, 1119-20 (3d Cir.1990)).

## C.    Warden DeRose is Entitled to Summary Judgment

Judged against these standards governing supervisory liability for constitutional torts, we find that Warden DeRose is entitled to summary judgment in his favor. This case involves a single, serious incident of alleged staff misconduct which occurred late on the evening of July 6, 2006. No one contends that the Warden directed, or participated in these acts. Nor does anyone present evidence of contemporary, subjective awareness of this misconduct by staff on the warden's part. Quite the contrary, here there is no direct evidence that Defendant DeRose had actual or constructive knowledge of any wrongdoing by prison staff at the time of these events. Furthermore, Defendant DeRose did not learn of the incident involving the Plaintiff until days after it had occurred. When he became aware of the incident, he conducted an investigation and determined that the Plaintiff's complaints against the Defendant officers lacked merit.

Moreover, by July 2006, the warden had established and was enforcing protocols at the prison which called for staff training on the appropriate use of force; which set staff inmate intake procedures; and which prescribed procedures for investigating and reporting of allegations of use of excessive force to appropriate officials. When the warden learned of this July 6, 2006, incident, he followed these procedures, and instructed that an appropriate inquiry be made into this matter.

In our view, the statements of three inmates and the Plaintiff do not establish the type of longstanding, pervasive, well-documented record of staff misconduct which would permit an inference that the warden had actual knowledge of staff misconduct. Notably these inmate witnesses do not attribute knowledge, participation or acquiescence to the warden. Furthermore, the opinion testimony offered by the Plaintiff's expert does not create a genuine issue of material fact on this question, since that opinion is based upon hearsay accounts of third parties, and relies upon those hearsay accounts to speculate that the warden should have been aware of alleged staff misdeeds. Since "only evidence which is admissible at trial may be considered in ruling on a motion for summary judgment," Countryside Oil Co., Inc. v. Travelers Ins. Co., 928 F.Supp. 474, 482 (D.N.J.1995), these hearsay assertions that do not establish knowledge or acquiescence in wrongdoing by the warden simply do not create a material issue of fact precluding summary judgment.[2] Thus, there is no competent evidence that shows that Defendant DeRose acted with deliberate indifference to any of the Plaintiff's civil rights in July 2006.

Nor can Smith premise supervisory liability on an Eighth Amendment claim of a failure to supervise by the warden. To sustain such a claim, "the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (3) the injury resulted from the policy or practice." Beers-Capitol, 256 F.3d at 134 (citing Sample v. Diecks, 885

---

[2]Similarly, Smith's reliance on citizen complaints that were brought to the warden's attention in July of 2007, one year after the events alleged in this lawsuit, does not defeat summary judgment here, since these later disclosures do not speak to the issue of the state of the warden's knowledge in 2006 when the events described in the complaint occurred.

F.2d 1099, 1118 (3d Cir. 1989). In this case Smith does not point to any policy or practice which created an unreasonable risk of safety to inmates. Quite the contrary, the evidence shows that appropriate policies were in place in July of 2006 governing inmate intake, use of force and investigation of staff misconduct. Therefore, if misconduct occurred here, it occurred in contradiction of prison policies, and did not conform with those policies. Proof that the alleged misconduct would violate prison policy is fatal to any claim of supervisory liability based upon institutional practice or policies.

The Plaintiff has failed to establish that Defendant DeRose was personally involved in the alleged misconduct and violation of the Plaintiff's constitutional rights. There is no evidence that the Plaintiff had actual or constructive knowledge of any wrongdoing by the Defendant Officers or any other member of the DCP staff. Thus, Defendant DeRose is entitled to summary judgment.

## D. The Dauphin County Board of Prison Inspectors and Dauphin County are Also Entitled to Summary Judgment.

These basic guiding principles, which compel the dismissal of the Plaintiff's claims against Warden DeRose, call for dismissal of the claims lodged by the Plaintiff against Dauphin County and its prison board. At the outset, the Dauphin County Prison Board is entitled to summary judgment because prison boards, similar to county prisons, lack the capacity to be sued. See Birckbichler v. Butler County Prison, 2009 WL 2986611, at *5 (W.D. Pa. Sept. 17, 2009). Indeed, the Plaintiff concedes that the Dauphin County Board of Prison Inspectors is not a proper Defendant. (Doc. 36 at 8).

Furthermore, with respect to such institutional Defendants such as Dauphin County, it is clear that a county cannot be held liable for the unconstitutional acts of its employees on a theory of respondeat superior. See Monell v. Department of Social

Servs., 436 U.S. 658, 691 (1978). Instead, with respect to such institutional defendants it is clear that: :[a plaintiff] must demonstrate that the violation of his rights was caused by either a policy or a custom of the [county]. See Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.1996)." Berg v. County of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000). See Malles v. Lehigh County, , 639 F. Supp.2d 566 (E.D. Pa. 2009).

> As the Malles Court stated:
>
> According to the teaching of Monell v. Department of Social Services, 436 U.S. 658(1978), [a] County "can be sued directly under § 1983 ... [when] the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the County's] officers" or where the constitutional deprivations occurred pursuant to governmental custom. Monell, 436 U.S. at 690.

Id. at 576.

In this case Dauphin County, as an entity, is entitled to summary judgment because the Plaintiff has not met the burden of establishing that a policy or custom of Dauphin County caused the alleged violation of civil rights. Nor has the Plaintiff shown that the county failed to train its officers resulting in alleged brutality against inmates including the Plaintiff. "In the absence of an unconstitutional policy, a municipality's failure to properly train its employees and officers can create an actionable violation of a party's constitutional rights under § 1983." Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) (citing City of Canton v. Harris, 489 U.S. 378, 388 (1989)). However, as the Court of Appeals observed in Kline ex rel. Arndt v. Mansfield, 255 F. App'x. 624 (2007):

> "Establishing municipal liability on a failure to train claim under § 1983 is difficult." Reitz, 125 F.3d at 145. "Failure to train ... municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations." See Berg v. County

of Allegheny, 219 F.3d 261, 276 (3d Cir.2000)(per curiam)(citing <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 408-09(1997)). While it is possible to maintain a failure to train claim without showing a pattern, the Supreme Court has stated that the burden on a plaintiff in such a case is high. <u>City of Canton</u> "did not foreclose the possibility that evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability." <u>Bryan County</u>, 520 U.S. at 409. Indeed, the Supreme Court noted [in the context of a failure to train law enforcement case]: in a narrow range of circumstances, a violation of federal rights may be a highly predicable consequence of a failure to equip law enforcement officers with specific tools to handle recurrent situations. The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train an officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice--namely, a violation of a specific constitutional or statutory right.

<u>Klein</u>, 255 F.App'x at 629.

Adopting this view, we find that the county had necessary and lawful policies in place, such as an oversight and training program for all officers. (Doc. 28 at 6-7). Specifically the county was required to comply with Title 37 of the Pennsylvania Code, Part II, Subpart B, Chapter 95 and Title 61 of the PA Statutes. (Doc. 29, Ex. 2). There is no indication it failed to comply with these requirements and the Defendants offer evidence that the county received a perfect score from state prison inspectors for its compliance with state laws, standards and regulations. (Doc. 29, Ex. 2).

Moreover, the evidence reveals that the county had training programs and policies in place as part of a training program, new recruits were placed on a probation period for six months and is closely monitored during this time. <u>Id</u>. A new officer received a copy of the prison's policies, including the Use of Force Policy. <u>Id</u>. Notably, this use of force policy at Dauphin County Prison called upon staff to utilize

a "continuum of force" concept when enforcing lawful staff orders. Under this force continuum principle, staff were specifically admonished to apply the minimum degree of force necessary to ensure safety and order in the prison. (Doc. 29.1, pp. 8-10)

A new officer also received two weeks of classroom training and spent an additional two weeks shadowing a senior officer prior to being assigned to a duty post. Id. In addition, all new recruits were sent to the Pennsylvania Department of Corrections Training Academy where they received five additional weeks of training. Id. The Corrections Academy provided training for officers on effective communications skills, applied professional and ethical behavior, and the proper use of force. Id. Once the training for new recruits was completed, all officers received additional annual training and other supplemental training. (Doc. 29, Ex. 1 at 12.) Notably, all officers at the DCP received the same training. Thus, if training is found to be relevant to a few officers, it was provided to all officers. (Doc. 29, Ex. 1 at 34-35).

In the face of this proof, the Plaintiff offers no evidence beyond mere assertions that the training at the prison was deficient or that it caused his alleged violation of civil rights. Nor has the Plaintiff created an genuine issue of fact regarding whether the county had notice of the need for further training. Given the rigorous legal standards that apply to such claims, this showing is insufficient to defeat summary judgment and the Dauphin County Board of Prison Inspectors and Dauphin County are entitled to summary judgment because the Plaintiff is unable to establish a claim against them upon which relief may be granted.[3]

---

[3]In addition, several other claims may be summarily disposed of at this time. For example, The Plaintiff concedes that the John Doe Defendants are entitled to summary judgment because the Plaintiff has failed to file a motion to the Court seeking leave to file an amended complaint naming the additional corrections officers involved in the alleged July 6, 2006 beating of the Plaintiff. (Doc. 36 at 15.) The Plaintiff also concedes that the Defendants are entitled to

In sum we conclude that the Plaintiff has not established legal grounds to support supervisory liability claims against the warden, the county or the county prison board arising out of this July 6, 2006 incident. Therefore, these claims should be dismissed.

## VI.   **RECOMMENDATION**

For the reasons set forth above, it is RECOMMENDED that the Court GRANT the Defendant's motion for partial summary judgment (Doc. 27) and grant summary judgment in favor of Defendants DeRose and Dauphin County. As per the stipulation of the parties, the John Doe Defendants and First Amendment claims of the Plaintiff should also be dismissed. Finally, since we do not deem the Plaintiff's complaint to specifically allege any constitutional infractions relating to the prison strip search

---

summary judgment on the his First Amendment Claims.  (Doc. 36 at 15).  While the parties devote great attention in their submissions to Fourth
Amendment issues relating to a strip search of the plaintiff, it does not appear that the Plaintiff has asserted a specific claim related to an unlawful strip search in his Complaint. Instead, the gravamen of the complaint seems to allege use of excessive. Thus, we find it unnecessary to address Fourth Amendment claims relating to that strip search.  (Doc. 28, Ex. 1).  Finally, The Defendants argue that the Plaintiff attempts to assert a direct claim pursuant to 42 U.S.C. § 1983 in his Complaint at Count I.  (Doc. 37 at 10; Doc. 1).  However, § 1983 is "not itself a source of substantive rights but [rather] a method for vindicating federal rights elsewhere conferred." Baker v. McCollan, 442 U.S. 137, 145 n.3 (1979).  "Section 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States. 'One cannot go into court and claim a violation of § 1983 - for § 1983 by itself does not protect anyone against anything.'" Gonzaga University v. Doe, 536 U.S. 273, 285 (2002) (citations omitted). The Plaintiff appears to agree that he is asserting a violation of his rights under the Constitution arising from the Defendants' use of excessive force through 42 U.S.C. § 1983, the "proper vehicle of seeking redress for these constitutional violations" and is not asserting argues a direct claim of some substantive rights pursuant to 42 U.S. C. § 1983.

policy, we decline to address the merits of those claims. Instead, it is recommended that the Plaintiff seek leave to amend his complaint if he wishes to pursue such a claim.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/MARTIN C. CARLSON*
Martin C. Carlson
United States Magistrate Judge

Dated: September 7, 2010

-23-